# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

№ 10-CV-00313 (JFB)

———————————

DANIEL NASH,

Petitioner,

VERSUS

GREEN HAVEN CORRECTIONAL FACILITY,

Respondent.

———————————

**MEMORANDUM AND ORDER**
August 21, 2014

———————————

JOSEPH F. BIANCO, District Judge:

Daniel Nash ("Nash" or "petitioner") petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C § 2254, challenging his conviction in the County Court, Suffolk County, State of New York, for murder in the second degree (N.Y. Penal Law § 125.25(1)), criminal possession of a controlled substance in the seventh degree (N.Y. Penal Law § 220.03), operating a motor vehicle while under the influence of drugs (N.Y. Vehicular and Traffic Law § 1192.4), and unlawful possession of marijuana (N.Y. Penal Law § 221.05). Petitioner was sentenced to an indeterminate period of incarceration of twenty-five years to life on his second degree murder conviction, to be served concurrently with sentences for one year's incarceration for possession of a controlled substance in the seventh degree, six months' incarceration for operating a motor vehicle under the influence of drugs, and fifteen days'

incarceration for unlawful possession of marijuana.

Petitioner challenges his conviction and sentence on the following grounds: (1) the hearing court incorrectly denied petitioner's motion to suppress his post-arrest statements; (2) petitioner was denied effective assistance of counsel; (3) the evidence against petitioner was insufficient to support a finding of guilt beyond a reasonable doubt; (4) petitioner's sentence was harsh and excessive.

For the reasons set forth below, the Court determines that the petition for habeas corpus is without merit. Accordingly, the Court denies the petition in its entirety.

## I. BACKGROUND

### A. Facts

The following facts were adduced from the petition and documents attached hereto,

as well as from the state court trial and appellate record.

### 1. The Murder

In the early morning hours of September 3, 2003, petitioner's wife Tara Nash ("Tara") was shot in the head while she sat inside her car near 500 Riverside Drive in Riverhead, New York. (*See* Tr. 695.[1]) Police officers responded to an emergency call of shots fired at 12:20 a.m. and observed a white SUV at the scene. (*Id.* at 695–99.) The vehicle was still running, but the headlights were turned off. (*Id.* at 699.) The doors were locked and all the windows rolled up and closed save one, which had been shattered. (*Id.*) Tara was slumped over in her seat, and one of the officers could see that she had been shot. (*Id.* at 699–701.) The officer called the Riverhead Town Volunteer Ambulance Corps, and responding volunteers attempted to stabilize Tara, who was still breathing. (*See id.* at 700–04, 711–12.) They could not save her, however, and Tara died at approximately 1:23 a.m. (*See id.* at 2998.)

Investigators later determined that Tara had been shot twice in the head by a .38 caliber gun. (*See id.* at 2572–87.)

### 2. Petitioner's Relationship with Tara

Although petitioner and Tara were married, the couple had been estranged for several months by the time of Tara's death. They argued over a variety of issues, including money, petitioner's failure to care for their children, extramarital affairs, and petitioner's use of Tara's car. (*See id.* at 1749–53.) Tara did not receive any monetary support from the petitioner and was in dire economic straits; however, she

was in the process of selling an annuity she had received from her father's estate, and she expected to receive a lump sum award of sixty thousand dollars. (*See id.* at 2668–69.) The petitioner had told his new girlfriend Angela Darden ("Darden") that he maintained a relationship with Tara only because he hoped to receive some of that money in a divorce. (*Id.* at 1486–87.)

On several occasions, Tara's cousin Crystal Hayes ("Hayes") observed Tara crying with bruises on her body following fights with petitioner. (*Id.* at 1757–59.) On June 27, 2003, Darden saw petitioner and Tara fighting and heard hitting followed by Tara's screams. (*Id.* at 2254.) At times, neighbors also saw the petitioner kicking and hitting Tara in the front yard. (*Id.* at 1505–08.) A mutual friend to both parties, Ethel, also witnessed similar conflicts. (*Id.* at 2398–99.) On one occasion in Ethel's apartment, petitioner was standing over Tara as he threatened to kill her and her boyfriend Terrell Faines ("Faines"). (*See id.* at 2415–17.) Ethel testified that she had observed a gun in the back waistband of petitioner's pants at that time.[2] (*See id.*)

### 3. Events Leading to Tara's Death

The day before Tara was killed, she and petitioner fought about petitioner's use of Tara's car. (*See id.* at 1770.) On the morning of September 2, 2003, petitioner arrived at Tara's house and took her to work in her car. (*Id.*) Petitioner returned to the house later

---

[1] "Tr." refers to the transcript of petitioner's trial.

[2] Petitioner's friend Sean Hardy ("Hardy") also testified to having seen petitioner with a gun on two occasions. The first time was several weeks before the murder, when the two were lifting weights in the garage at Tara's house. (*See id.* at 2008–13.) The second time was when the two returned from a night club. (*See id.*) The petitioner took the gun out, aimed at passersby, and pretended to shoot until Hardy told petitioner to stop. (*Id.*)

that night with his friend Hardy, and there were three additional guests in the house: April Welton ("Welton"), Welton's daughter, and Welton's husband; Hayes was being paid to braid the girl's hair. (*See id.* at 1779.) When he petitioner arrived, he and Tara argued first in the kitchen, then in the garage. (*See id.* at 1785.) Petitioner questioned Tara about why she wanted the keys back, implying that she wanted to go out with Faines. (*See id.* at 1792.) Welton and her husband witnessed this argument as they smoked outside of the house. Welton testified that they both appeared to be very angry. She also saw petitioner drop a black and chrome revolver with a black handle, and then watched petitioner stoop to pick it up. (*See id.* at 1176–82.) Petitioner put the gun back in his waist band, continued the argument, and then returned with Tara into the house. (*See id.* at 1188.)

Petitioner then left Tara's house with Hardy. Petitioner said to Hardy that "he wished he could kill that bitch and get away with it." (*Id.* at 2073.) Hardy testified that petitioner had previously made similar statements. (*Id.* at 2074.)

After petitioner and Hardy left, Tara went on a date with Faines. (*See id.* at 1386–89, 1831.) Tara drove Faines home at approximately 11:58 p.m. (*See id.* at 1393, 1400, 1832, 1834.) Meanwhile, Darden saw petitioner at the Milbook Apartments between 10:00 and 10:30 p.m. that night while she was going out for pizza with her friend. (*See id.* at 2194.) Later on that night, Darden invited petitioner back to her apartment. (*See id.* at 2206.)

Darden and petitioner were in Darden's apartment at approximately midnight when Tara rang the doorbell. (*See id.* at 2209.) Darden got up to answer and told petitioner that Tara was at the door. Petitioner tried to leave the apartment through a back window.

(*Id.* at 2213.) Once told that Tara already knew he was there, petitioner went out to speak to her. Darden opened a window to hear their argument. (*Id.* at 2218.) She saw them arguing, petitioner putting his arm on Tara, either grabbing it or just touching it, and then Tara walked away. (*See id.* at 2226.) Tara entered her car and drove away quickly, leaving skid marks on the road. (*Id.*) A witness testified that Tara seemed upset, and as if she were crying. (*Id.* at 940–43, 946–49.) The same witness also saw taillights traveling in the same direction as Tara, though he could not be sure whether it was petitioner or not. (*Id.*)

As discussed *supra*, Tara was shot shortly thereafter.

### 4. The Investigation

Suffolk County homicide detectives went to speak with petitioner at 5:00 a.m. on the day of Tara's death. (*See id.* at 2904.) Petitioner informed the detectives that he had last seen Tara at 7:00 p.m. the previous day. (*See* H. 12/20/04, at 50–52. [3]) He claimed that he had gone to a gas station between 11:30 p.m. and 12:00 a.m., but otherwise remained at home that night. (*See id.*) After speaking to the police for approximately ten minutes, petitioner asked why he was being questioned about Tara. (*Id.* at 52.) He was then informed that Tara had been shot, at which point he became emotional. (*See id.*) Petitioner then told the detectives that his sister had seen Tara with someone in her SUV, and that the police should investigate Faines. (*See id.* at 52–53.) Petitioner complied with the detectives' request to search his car, answered all their questions, and was cooperative. (*See id.* at

---

[3] "H. 12/20/04" refers to the transcript of the hearing held on December 20, 2004.

3

53–54.) The police found nothing of interest in petitioner's car. (Tr. 2921.)

The next day, the detectives visited petitioner again at the Tuthill Funeral Home, where they took petitioner's written statement. (*See* H. 12/20/04, at 55–56.) In this statement, petitioner admitted to having seen Tara between 11:00 and 11:30 p.m. on the night of her death while he was with Darden. (Tr. 2954.) According to petitioner, Tara had accused him of having an affair. (*See id.*) He claimed that he then returned home to his mother's house by 11:30 p.m. and stayed there until the police arrived the morning of September 3, 2003. (*See id.*)

While the police were conducting their investigation, petitioner attempted to withdraw money from Tara's annuity account, called her co-workers to try to retrieve Tara's last paycheck, and inquired as to what benefits he was entitled to as the living spouse of the deceased. (*See id.* at 2351–52, 2486, 2497–98, 2501.) Acquaintances said that petitioner's grief following the murder was not genuine. (*See id.* at 1862, 1865, 1873–74, 2093–94, 2312–21, 2501.)

### 5. The Arrest

On September 30, 2003, New York State Troopers stopped petitioner's car because the car's rear license plate lamp was out, the driver was not wearing his seatbelt, and the car had crossed a double yellow line when it made a turn. (H. 12/16/04, at 10–13.[4]) As the troopers pulled the car over, the passenger, Terence Lattimore ("Lattimore"), testified that petitioner said to him: "they pulling us over in the same spot I killed my wife." (*Id.* at 1608.) When Lattimore

questioned petitioner, petitioner changed his statement, saying that "[t]his is the spot where they found my wife killed." (*Id.* at 1609.)

As the troopers approached the car, they smelled marijuana. (H. 12/16/04, at 16–17.) Both petitioner and Lattimore admitted to smoking marijuana and were arrested. (*Id.* at 16–17, 21, 25.) At the troopers' barracks petitioner was read his *Miranda* rights, agreed to waive his rights, and consented to further drug and alcohol level tests. (*Id.* at 30–33, 49–52.)

Investigator O'Sullivan ("O'Sullivan") was brought in from the East End Drug Task Force to talk to petitioner. (H. 12/17/04, at 3–6.[5]) While speaking to O'Sullivan, petitioner said that he believed it was a sick joke that he was picked up in the same place that his wife was murdered. (*Id.* at 11.) When O'Sullivan asked petitioner if he knew anything about the murder, petitioner began to cry and responded that he did not know anything about it. (*Id.*) The petitioner then became agitated and stated that he had already spoken to the detectives about it. (*See id.* at 12–14.)

Sometime thereafter, Detective Mercer of the Suffolk County homicide squad arrived and arrested the petitioner. (*See* H. 12/20/04, at 67–70.) He placed petitioner in his squad car and advised petitioner of his *Miranda* rights. (*See id.* at 68–76) Detective Mercer did not inform petitioner why he was under arrest. (Tr. 2971.) Petitioner waived his rights and responded to Detective Mercer's questions. (*Id.* at 2975.) However, at police headquarters, petitioner refused to sign the *Miranda* Warnings Card or

---

[4] "H. 12/16/04" refers to the transcript of the hearing held on December 16, 2004.

[5] "H. 12/17/04" refers to the transcript of the hearing held on December 17, 2004.

anything else, but he did not request a lawyer. (*See id.* at 2978–79.)

Detective Mercer questioned petitioner about owning a .38 caliber gun, and petitioner admitted to having owned one at one time, but stated that he had sold it a long time ago. (*See id.* at 2976.) Eventually, petitioner asked whether he was being arrested for the murder of his wife. (*Id.* at 3049.) Detective Mercer confirmed that he was. (*Id.*) Detective Mercer proceeded to tell petitioner (falsely) that, in fact, his wife had spoken to the EMT workers about who had shot her before she died. (*See id.* at 2979.) Petitioner responded by saying "that can't be good for me." (*Id.*) When Detective Mercer stated further that Tara identified petitioner as her shooter, petitioner stopped answering the questions and responded "punch me, beat me, kill me, my life's over." (*See id.* at 2980.) He also indicated regret over providing a statement to the police at the funeral home. (*See id.* at 2980–81.) After that time, petitioner refused to answer any more questions. (*See id.* at 3054.)

### B. Procedural History

#### 1. Pre-Trial Suppression Hearings

A grand jury returned an indictment charging the petitioner with intentional second degree murder, reckless second degree murder, seventh degree criminal possession of a controlled substance, misdemeanor operating a motor vehicle under the influence of drugs, and unlawful possession of marijuana. Petitioner entered a plea of not guilty to the charges against him.[6]

---

[6] The charge of reckless second-degree murder was withdrawn during the trial.

Before trial, a combined *Dunaway* and *Huntley* hearing was conducted to determine whether the police had probable cause to arrest the defendant and whether statements made by petitioner to the police were given voluntarily or not. At the hearing, petitioner's counsel sought to inquire into whether petitioner had also been denied his right to counsel, but that request was denied (H. 12/16/04, at 3–6.) Following the hearing, the hearing court concluded that the observation of petitioner's intoxication while driving was sufficient to justify his arrest. The hearing court also held that petitioner's statements were made voluntarily. Finally, the hearing court held that petitioner's statements were admissible under *Miranda*. The court determined that petitioner was not in custody when he gave the statement at the funeral home. Moreover, the court concluded that petitioner's oral statements made to O'Sullivan were made after petitioner had been read his *Miranda* rights. Similarly, the court concluded that petitioner's statements made to Detective Mercer were made after petitioner was read his *Miranda* rights. Although Detective Mercer did lie about the state of petitioner's wife when she was found, the court found that Detective Mercer did nothing to compel petitioner to make oral statements. Accordingly, petitioner's motion to suppress his oral and written statements was denied in its entirety on January 5, 2005. (*See* Order, Jan. 5, 2005.)

Upon the request of defense counsel, on February 24, 2005, the hearing court amended its prior decision to address the issue of whether Detective Mercer had probable cause to arrest the defendant for murder. The hearing court concluded that there was probable cause to arrest petitioner for second degree murder at that time.

## 2. Trial and Sentencing

The following details of petitioner's trial are relevant to the instant petition. At trial, the prosecution presented its case by calling police personnel, medical personnel, family and friends of both parties, and a medical examiner. The prosecution also introduced petitioner's written and sworn statement made before his arrest. The prosecution argued that petitioner's relationship with Tara was acrimonious and abusive by presenting evidence that petitioner had yelled at and physically attacked Tara. (*See* Tr. 1508, 2388, 2562.) The prosecution also presented testimony that petitioner stated on more than one occasion that he wished he could kill Tara and "get away with it." (*See id.* at 2073.) Having determined that Tara's death was caused by two gun shots to the head, delivered from a .38 caliber pistol, the prosecution also provided testimony establishing that the petitioner had owned such a gun, and that it had been seen on his person recently before the murder took place. (*See id.* at 1195, 2008, 2414.)

Defense counsel emphasized the circumstantial nature of the prosecution's case, argued that the prosecution's witnesses were not credible, and maintained that the prosecution had failed to prove the requisite *mens rea* for second degree murder. He also called two witnesses for the defense. The first was a former police lieutenant and private investigator who testified that a gun does not make a metallic sound when it falls on the ground. (*See id.* at 3106.) This testimony was meant to discredit Welton's testimony about what she heard while Tara and petitioner were arguing in the garage on the night of Tara's death. (*See id.* at 1176.) The second witness was Christopher Stewart ("Stewart"), who was then serving time at the Elmira Correction Facility. Stewart testified that he had seen Tara and Faines arguing in a white Chevrolet Blazer on the

night of Tara's death. (*See id.* at 2123–34.) He also testified that Faines had tried to sell him a nine millimeter gun at some point.[7] (*See id.*)

On January 16, 2006, following a jury trial, petitioner was convicted of murder in the second degree. He was sentenced to an indeterminate prison term of twenty-five years to life, to run concurrently with one year's imprisonment for possession of a controlled substance in the seventh degree, six months' imprisonment for operating a motor vehicle under the influence of drugs, and fifteen days' imprisonment for unlawful possession of marijuana.

## 3. Appeal

Petitioner appealed his conviction to the Appellate Division on the following grounds: (1) the trial court refused to include the lesser included charges of manslaughter in the first degree and manslaughter in the second degree in its jury instructions; (2) the hearing court failed to suppress petitioner's statements to police; (3) ineffective assistance of trial counsel; (4) insufficient evidence; and (5) the sentence imposed was excessive and unjust. The Appellate Division affirmed petitioner's conviction on June 17, 2008. *See People v Nash*, 858 N.Y.S.2d 905 (N.Y. App. Div. 2008). The New York Court of Appeals denied petitioner's motion for leave to appeal on August 22, 2008. *See People v. Nash*, 11 N.Y.3d 739 (2008).

---

[7] When asked why he did not follow up on Stewart's story, Detective James Madden testified that he had not believed Stewart's story to be credible based upon what Stewart had said, where he had been at the time, and his direction of travel. (*See* Tr. 3257–60.)

### 4. The Instant Petition

Petitioner filed the instant petition on January 15, 2010. Respondent filed its memorandum in opposition on March 18, 2010. On June 18, 2012, the Court granted petitioner's request to exhaust his ineffective assistance of counsel claim in state court and held the petition in abeyance. (*See* Order, June 28, 2014, ECF No. 13.) In a letter dated November 1, 2013, petitioner informed the Court that he had exhausted his ineffective assistance of counsel claims in state court. This matter is now fully submitted, and the Court has fully considered the submissions of the parties.

## II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "'Clearly established Federal law'" is comprised of "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). Additionally, while "'[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact . . . are

reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

## III. DISCUSSION

Petitioner has argued that he is entitled to habeas relief on four grounds: (1) the hearing court should have suppressed his post-arrest statements; (2) he was denied effective assistance of counsel; (3) the evidence presented at trial was insufficient to support a finding of guilt beyond a reasonable doubt; and (4) his sentence was excessive. Respondent does not contest that these arguments have been sufficiently preserved for habeas review, but contends that the petitioner's claims are meritless. For the following reasons, this Court concludes that petitioner's claims are patently without merit and denies the petition in its entirety.

## A. Failure to Suppress Statements

Petitioner argues that his statements to the police should have been suppressed for two reasons: (1) the police lacked probable cause to arrest him; and (2) Detective Mercer's failure to inform him about the reason for his arrest, as well as his affirmative misrepresentations during his interrogation of petitioner, rendered the petitioner's statements involuntary and their use a violation of the petitioner's *Miranda* rights. (*See* Pet. 6.)

For the following reasons, petitioner has not demonstrated that the state court decision was contrary to, or involved an unreasonable interpretation of, federal law, nor has he demonstrated that the state court's decisions resulted in a decision that was based upon an unreasonable determination of the facts. Accordingly, petitioner is not entitled to habeas relief on the basis of this claim.

### 1. Unlawful Arrest

Petitioner claims that his statements should have been suppressed because they were obtained in violation of his Fourth Amendment rights against illegal search and seizure. Specifically, petitioner argues that the police did not have probable cause to arrest him.

Under *Stone v. Powell*, this Court is barred from reviewing petitioner's Fourth Amendment claim. *See* 428 U.S. 465 (1976). "[A] federal habeas corpus court may not review a Fourth Amendment claim, such as illegal detention, 'where the State has provided an opportunity for full and fair litigation' of the claim." *McNeal v. Rdo*, No. 88-CV-3435 (MGC), 1988 WL 108440, at *3 (S.D.N.Y. Oct. 6, 1988) (citing *Stone*, 428 U.S. at 494), *aff'd*, 888 F.2d 126 (2d Cir. 1989). In the Second Circuit, a federal court on habeas review may only review petitioner's Fourth Amendment violation claim if "'(a) the state has provided no corrective procedures at all to redress the alleged Fourth Amendment violations or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process.'" *Mejias v. Allard*, No. 03-CV-5195 (NGG)(LB), 2006 WL 119033, at *20 (E.D.N.Y. Jan. 13, 2006) (quoting *Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir. 1992)). The Second Circuit has approved New York's corrective procedure, embodied in New York Criminal Procedure Law § 710, as facially adequate to redress alleged Fourth Amendment violations. *See Capellan*, 975 F.2d at 70 n.1. Moreover, there is no evidence of an unconscionable breakdown in that process in this case. Here, petitioner challenged the constitutionality of his detention at both the pre-trial suppression hearings and on appeal to the Appellate Division. Having availed himself

8

of New York's corrective procedures regarding his Fourth Amendment claim, petitioner has had an opportunity for full and fair litigation of the claim and may not raise it on federal habeas review.

Even assuming *arguendo* that the Court could review the underlying merits of this claim, the Court concludes that the claim fails on the merits. Based upon the facts presented at the hearing, the state court had sufficient evidence upon which to conclude that there was probable cause for the police to stop petitioner's car, and later to arrest him. During the *Dunaway/Huntley* hearing, the arresting officer testified that he stopped petitioner's car because of traffic violations and arrested petitioner for driving under the influence of drugs after the petitioner failed several sobriety tests. (*See* H. 12/17/04, at 13–25.) Certainly the officer was warranted in arresting petitioner on the basis of his observations of traffic violations and petitioner under the influence of drugs. *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 810 (1996) (holding that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred").

In sum, the Court is barred from reviewing plaintiff's Fourth Amendment claim but, even if it could, concludes that the claim is patently without merit.

## 2. Voluntariness of Confession

Petitioner further claims that his statements to the police should have been suppressed because they were not made voluntarily, and his waiver of his *Miranda* rights was invalid, because of Detective Mercer's false statements and failure to inform him that he was under arrest for murder.

As an initial matter, the "ultimate issue of voluntariness [of a confession] is a legal question requiring independent federal determination." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997) (citing *Arizona v. Fulminante,* 499 U.S. 279, 287 (1991)); *see also Nova v. Bartlett*, 211 F.3d 705, 707 (2d Cir. 2000); *Mincey v. Arizona*, 437 U.S. 385, 396 (1978) (holding that habeas court is not bound by state court's determination that statement was voluntary; "[i]nstead, the Court is under a duty to make an independent evaluation of the record"). Factual questions underlying a legal determination are entitled to a presumption of correctness under 28 U.S.C. § 2254(d), however. *Nelson*, 121 F.3d at 833. In this regard, the Second Circuit has noted that "the statutory presumption refers to historical facts, that is, recitals of external events and the credibility of the witnesses narrating them." *Id.* (internal citation and quotation marks omitted). Thus, "[i]f the material facts were not adequately developed at the State court hearing or the District Court finds that the factual determination is not fairly supported by the record, the presumption of correctness is set aside." *Id.* (citation and internal quotation omitted).

When evaluating the voluntariness of a confession, no one factor is determinative; rather, the totality of the circumstances must be evaluated. *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988). The factors to be considered include (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials. *Id.* at 901–02. Here, there is ample evidence to support the state court's determination that petitioner voluntarily made incriminating statements after being advised of his *Miranda* rights. The factual findings of the New York courts are presumed to be correct because they were made after extensive development of

9

the material facts and were supported by the record. The arresting officer advised petitioner of his *Miranda* rights prior to the petitioner's discussion with O'Sullivan or any other police officer. The state court concluded that petitioner was capable of understanding his *Miranda* rights, and he did not argue otherwise at the *Huntley* hearing. Moreover, petitioner affirmatively agreed to speak with O' Sullivan when he was asked if he was willing to do so. (*See* H. 12/17/04, at 146.) Similarly, Detective Mercer read petitioner his *Miranda* rights prior to asking any questions. Petitioner again agreed to speak with Detective Mercer, answering questions about his ownership of a .38 caliber gun during the car ride to Suffolk County police headquarters. At the station, there is no indication that the conditions of petitioner's interrogation with Detective Mercer became coercive at all; for instance, there is no evidence of threats or promises made to compel petitioner to speak.

Petitioner argues that his waiver of *Miranda* rights was invalid, and his statements were involuntary, because the police failed to inform him that he was under arrest for murder. This particular argument is without merit. Although the police did not inform petitioner that he was being questioned in relation to the murder of his wife, the Supreme Court has held that mere silence as to the charges of an arrest is insufficient to invalidate a suspect's waiver of *Miranda* rights. *See Colorado v. Spring*, 479 U.S. 564, 576 (1987). Therefore, it was unnecessary for Detective Mercer to inform petitioner of the reasons for his arrest, and the failure to do so does not render his waiver invalid. Additionally, while Detective Mercer did not state that petitioner was specifically under arrest for murder, the Court notes that petitioner knew the detective was investigating Tara's death, having spoken to him twice in relation to the

murder. Petitioner, therefore, had reason to know why he was being questioned.

Secondly, petitioner argues that Detective Mercer lied about his wife identifying him as her shooter to the EMTs attending her. However, affirmative misrepresentation by police in an interrogation, without more, is insufficient to render a confession involuntary or a *Miranda* waiver invalid. *See, e.g.*, *United States v. Velasquez*, 885 F.2d 1076, 1088 (3d Cir. 1989) (holding that police lies to suspect about facts of case did not invalidate otherwise valid *Miranda* waiver); *Dallio v. Spitzer*, 170 F. Supp. 2d 327, 340 (E.D.N.Y. 2001) ("The fact that the police lie to a suspect to elicit his confession does not necessarily render it involuntary." (internal citation and quotation marks omitted)). Instead, false statements by police are considered as only one factor among many in assessing the voluntariness of a suspect's statements. *See, e.g.*, *Dallio*, 170 F. Supp. 2d at 340. Here, the totality of the circumstances in this case do not suggest that petitioner's confession was the product of conduct that would overbear his will to resist. Instead, petitioner's confession was "the product of an essentially free and unconstrained choice by its maker." *United States v. Moreno*, 701 F.3d 64, 76 (2d Cir. 2012) (internal citation and quotation marks omitted).

In sum, the Court determines that petitioner's confession was voluntary, and his waiver of his *Miranda* rights was valid. Therefore, there is no basis for habeas relief on this claim.

### B. Ineffective Assistance of Counsel

Petitioner also contends that he is entitled to habeas relief because his trial provided constitutionally ineffective assistance. (Pet. 8.) In particular, petitioner

cites the following supposed failings of trial counsel: (1) the failure to object to the introduction of statements attributed to the petitioner that were not the subject of the *Huntley* hearing; (2) the failure to categorize the petitioner's statements as admissions rather than confessions, and (3) the failure to request a voluntariness charge for the jury as support for petitioner's argument.

### 1. Legal Standard

Under *Strickland v. Washington*, a habeas petitioner is required to establish two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 680, 694 (1984).

The first prong requires a showing that counsel's performance was deficient. However, "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that a "'fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.'" *Id.* (quoting *Rompilla v. Beard*, 545 U.S. 374, 408 (2005)). In assessing performance, a court "must apply a 'heavy measure of deference to counsel's judgments.'" *Id.* (quoting *Strickland*, 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is

typically the case, the lawyer has a reasonable justification for the decision," and "'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *DeLuca v. Lord*, 77 F.3d 578, 588 & n.3 (2d Cir. 1996) (quoting *Strickland*, 466 U.S. at 690–91). "However, 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 690–91).

The second prong focuses on prejudice to a petitioner. A petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that they 'undermine[] confidence in the outcome.'" *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). "'[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt.'" *Henry v. Poole*, 409 F.3d 48, 63–64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695). "'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of *Strickland*, the determination of prejudice may be made with the benefit of hindsight." *Hemstreet v. Greiner*, 491 F. 3d 84, 91 (2d Cir. 2007) (internal citation and quotation marks omitted).

This Court proceeds to examine petitioner's ineffective assistance of counsel claim, keeping in mind that he bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004). As set forth below, petitioner's claim fails to satisfy both prongs of the *Strickland* test.

### 2. Application

#### a. Failure to Object to Statements

Petitioner argues that his counsel failed to object to the admission in evidence of certain incriminating statements. The premise of petitioner's position is that the hearing court did not already rule on the admissibility of these statements, and that defense counsel did not object to their admissibility. Petitioner is mistaken. In defense counsel's original omnibus motion calling for the *Huntley* hearing, counsel specifically sought to suppress the written statements made to Detective Mercer outside the funeral home, oral statements made to State Troopers on the morning of September 30, 2003, and statements obtained from petitioner after his arrest by detectives from the Suffolk County Homicide Squad on September 30, 2003. (*See* Def.'s Trial Motion.) The hearing court addressed the admissibility of all these statements and denied the motion to suppress in its entirety. Thus, the record demonstrates that defense counsel did challenge the admissibility of petitioner's statements, and he cannot be faulted for not objecting to their admission in evidence after the hearing court reached its decision. In particular, there were no additional objections regarding the admissibility of the

statements that could have been made. [8] Thus, counsel's conduct was objectively reasonable.

Moreover, even if defense counsel's performance were deficient in some way, petitioner has failed to prove that defense counsel's failure to prevent the admission of the statements identified by petitioner prejudiced his case. While all of petitioner's statements provided support to the prosecution's case, the most damaging statement to petitioner's defense was "that can't be good for me"—a statement petitioner concedes his defense counsel sought to suppress. In light of this statement and the other evidence of guilt, which was strong, petitioner has not carried his burden of proving that admission of his other statements caused him prejudice.

#### b. Admission vs. Confession Charge

Next, petitioner contends that counsel's failure to request a jury charge explaining the difference between an admission and a confession warrants habeas relief. Petitioner argues that the jury put undue emphasis on the statements he made, taking them to be a confession, and a direct acknowledgement of guilt, rather than circumstantial evidence of guilt.

Although the trial court did not instruct the jury on the difference between an admission and a confession, the trial court did give an expanded circumstantial evidence charge, and the trial court cautioned the jury on deciding the case on the basis of circumstantial evidence, alone, telling the jury that they must find the defendant not guilty if there was any

---

[8] For the same reason, petitioner cannot show prejudice from the failure to make any additional objections.

inference of innocence based on the circumstantial evidence. (Tr. 3480–84). In light of this charge, it was not objectively unreasonable for counsel to forego a request for a more detailed charge of the kind petitioner describes. Moreover, even if this failure were objectively unreasonable, petitioner has not shown that he was prejudiced by this failure. He gives no indication as to how such a charge would have influenced the jury in any way, and given the overwhelming evidence of petitioner's guilt (discussed *infra*), the Court concludes that any such additional instruction would not have changed the outcome of the case.

### c. Voluntariness Charge

Petitioner also contends that counsel rendered ineffective assistance in failing to request a voluntariness charge.

Under New York law, "when the defense presents evidence at trial sufficient to demonstrate a question of fact regarding the voluntariness of the defendant's statement, the court must submit the issue to the jury with instructions to ignore the statement if it determines that it was involuntarily made." *People v. Perretti*, 719 N.Y.S.2d 145, 147 (N.Y. App. Div. 2000) (citing N.Y. Crim. Proc. Law § 710.70(3); *People v. Graham*, 55 N.Y.2d 144 (1982); *People v. Cefaro*, 23 N.Y.2d 283 (1968)).[9]

---

[9] The Court notes that the United States Constitution does not require the submission of the voluntariness issue to a jury after it has already been decided by a judge. In *Lego v. Twomey*, the Supreme Court explicitly rejected a state petitioner's "contention that, even though the trial judge ruled on his coercion claim, he was entitled to have the jury decide the claim anew." 404 U.S. 477, 489 (1972). The Court held that the Constitution does not require "submission of voluntariness claims to a jury as well as a judge." *Id.* Thus, to the extent petitioner also seeks habeas relief on the basis that the trial judge

However, New York law does not require a trial judge to give a voluntariness instruction if there is no genuine issue of fact concerning the voluntariness of the defendant's statements. *See, e.g.*, *People v. White*, 811 N.Y.S.2d 473, 475 (N.Y. App. Div. 2006) (upholding decision not to give voluntariness instruction where defense had "failed to raise a factual dispute in which reasonable people could differ as to the voluntariness of defendant's statement" (citing cases)); *People v. Gutierrez*, 787 N.Y.S.2d 266, 267 (N.Y. App. Div. 2004) ("Since there was no other factual issue raised at trial concerning the voluntariness of defendant's statement, the court was not required to instruct the jury on that subject." (citing cases)).

Here, as discussed *supra* in connection with petitioner's voluntariness claim, there is simply no evidence in the trial record indicating that plaintiff's statements were made involuntarily, and petitioner fails entirely to point to any such evidence in his habeas petition. Accordingly, it is unlikely that the trial court would have given such an instruction if requested, and the Court cannot conclude that counsel acted unreasonably in declining to request an instruction that the trial court likely would not have given. *See, e.g.*, *Shire v. Costello*, No. 07-CV-285, 2008 WL 2323379, at *12 (N.D.N.Y. June 2, 2008) ("Counsel cannot now be deemed ineffective for failing to make a argument or objection that stood

---

failed to give a voluntariness instruction, such a claim is meritless and would not entitle him to habeas relief. *See, e.g.*, *Fernandez v. Lee*, No. 10-CV-9011 (ALC)(JCF), 2012 WL 4473294, at *12 (S.D.N.Y. July 12, 2012), *report & recommendation adopted*, 2012 WL 4478998 (S.D.N.Y. Sept. 28, 2012); *White v. Conway*, No. 07-CV-1175, 2011 WL 1315592, at *18 (N.D.N.Y. Mar. 31, 2011); *Zapata v. Greene*, No. 03-CV-5730, 2005 WL 1521186, *13 (E.D.N.Y. June 27, 2005).

little chance of success." (citing *United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999)). Moreover, the absence of any evidence supporting petitioner's claim of involuntariness means that petitioner suffered no prejudice from counsel's failure to request a voluntariness instruction. Even if counsel had requested a voluntariness instruction and the trial court granted the request, there is absolutely no evidence from which the jury could have concluded that petitioner's statements had not been made voluntarily. In sum, petitioner has not carried his burden of showing objectively unreasonable performance and a reasonable probability that the result of his trial would have been different had the jury been given a voluntariness instruction. Accordingly, this claim does not entitle petitioner to habeas relief.

## C. Sufficiency of the Evidence

Petitioner claims that the evidence presented at trial was legally insufficient to prove his guilt as to the second-degree murder charge beyond a reasonable doubt, thus violating his Fourteenth Amendment right to due process. In support of this claim, petitioner argues that the forensic evidence and testimony presented at trial failed to prove beyond a reasonable doubt that petitioner possessed the requisite intent to be found guilty of murder in the second degree. (*See* Pet. 9.) Instead, he argues, the evidence at best supports the view that petitioner shot at his wife with the intention to seriously injure, as opposed to kill, her, or that he intended to frighten her and acted recklessly. (*Id.*)

### 1. Legal Standard

The law governing habeas relief from a state conviction based on insufficiency of evidence is well established. A petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in a state criminal conviction. *Einaugler*, 109 F.3d at 840. A criminal conviction in state court will not be reversed if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see, e.g.*, *Flowers v. Fisher*, 296 F. App'x 208, 210 (2d Cir. 2008) (summary order); *Policano v. Herbert*, 507 F.3d 111, 115–16 (2d Cir. 2007); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002). A criminal conviction will stand so long as "a reasonable mind 'might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) (internal quotation marks omitted) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)). Even when "faced with a record of historical facts that supports conflicting inferences [a court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolves any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994) (quoting *Jackson*, 443 U.S. at 326).

When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999). Accordingly, in this case, the Court looks to New York law for the elements of murder in the second degree. Under the relevant New York law, "[a] person is guilty of murder in the second degree when . . . [w]ith intent to cause the death of another person, he causes the death of such person or of a third person." N.Y. Penal Law § 125.25(1).

## 2. Application

At trial, the prosecution presented overwhelming evidence connecting petitioner to the murder of Tara and his intent to kill her. The trial record includes multiple accounts of petitioner's tumultuous and sometimes violent relationship with Tara. On one occasion, someone observed petitioner threaten to kill Tara. Hardy also testified that petitioner had indicated his desire to kill Tara before the night of Tara's death. The same night that Tara was killed, petitioner was observed fighting with Tara while possessing a chrome revolver. Following that argument, petitioner told his friend Hardy that "he wished he could kill that bitch and get away with it." Later that night, petitioner and Tara argued again, and within minutes of that argument, Tara was shot and killed. After Tara's death, petitioner tried to collect money belonging to Tara's estate. Additionally, just before petitioner was arrested, he informed Lattimore that the police were pulling them over "in the same spot I killed my wife." Finally, petitioner's statements to the police, including his admission that he had owned a handgun of the same caliber as the murder weapon, and his comment that it could not be good for him if Tara had identified her killer before she died, provided even more proof that petitioner killed Tara with the specific intent to do so. Viewing this evidence in a light most favorable to the prosecution, and assuming the jury found every prosecutorial witness credible, the Court concludes that a reasonable trier of fact could find beyond a reasonable doubt that petitioner committed the crime of second-degree murder. For purposes of habeas review, it is immaterial that a different jury could have inferred a lesser *mens rea* than intent to kill; it suffices that a jury reasonably could find beyond a reasonable doubt petitioner's intent to kill based on this evidence. Accordingly,

petitioner is not entitled to habeas relief on this basis.

## D. Excessive Sentence

Finally, petitioner maintains that the sentence imposed for second-degree murder—an indeterminate period of twenty-five years to life—was unduly harsh.

For the purpose of habeas review, "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." *White v. Keane*, 969 F. 2d 1381, 1383 (2d Cir. 1992); *see also Alfini v. Lord*, 245 F. Supp. 2d 493, 502 (E.D.N.Y. 2003) ("It is well settled that an excessive sentence claim may not be raised as grounds for habeas corpus relief if the sentence is within the range prescribed by state law." (collecting cases)); *McCalvin v. Senkowski*, 160 F. Supp. 2d 586, 589 (S.D.N.Y. 2001) ("Sentencing decisions are not cognizable on habeas corpus review unless the sentence imposed falls outside the range prescribed by state law."); *Thomas v. Senkowski*, 968 F. Supp. 953, 956–57 (S.D.N.Y. 1997) (dismissing excessive sentence claim where the petitioner's sentence fell within the range prescribed by state law).

In the instant case, petitioner was convicted of second-degree murder under New York law, which carries a maximum sentence of life imprisonment. *See* N.Y. Penal Law § 70.00. Because petitioner's sentence fell within the statutorily prescribed range, there is no federal issue cognizable on habeas review.[10] *See Burvick v. Brown*, No. 10-CV-5597 (JFB), 2013 WL 3441176, at *11 (E.D.N.Y. July 9, 2013)

---

[10] Even assuming *arguendo* that the Court could review the sentence, the Court concludes that it was not excessive in light of the crime of conviction, including the manner in which it was committed.

(finding no federal question for habeas review where sentence was within statutorily prescribed range); *Bell v. Ercole*, 631 F. Supp. 2d 406, 419 (S.D.N.Y. 2009) (same). Accordingly, petitioner's excessive sentencing claim does not provide a basis for habeas relief in this case.

IV. CONCLUSION

For the reasons set forth herein, the Court concludes that petitioner has demonstrated no basis for habeas relief under 28 U.S.C § 2254. Petitioner's claims are plainly without merit. Therefore, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 21, 2014
       Central Islip, NY

\*       \*       \*

Petitioner proceeds *pro se*. Respondent is represented by Thomas J. Spota, District Attorney of Suffolk County, by Michael J. Miller, 200 Center Drive, Riverhead, NY 11901.